Matthew L. Rollin (SBN 332631)
**SRIPLAW, P.A.**
145 South Fairfax Avenue
Suite 200, PMB 17382949
Los Angeles, CA 90036
323.452.5600 – Telephone
561.404.4353 – Facsimile
matthew.rollin@sriplaw.com

*Counsel for Plaintiff*
*Betty's Best, Inc.*

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BETTY'S BEST, INC.,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., f/k/a FACEBOOK, INC.,<br><br>Defendant. | CASE NO.: 5:26-cv-13646<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT, TRADEMARK INFRINGEMENT AND COUNTERFEITING, FALSE DESIGNATION OF ORIGIN, DESIGN PATENT INFRINGEMENT, AND UNFAIR COMPETITION**<br><br>**(INJUNCTIVE RELIEF DEMANDED)** |

Plaintiff Betty's Best, Inc. (“Betty's Best” or “Plaintiff”), by and through its undersigned counsel, brings this action seeking monetary, declaratory, and injunctive relief against Defendant Meta Platforms, Inc., f/k/a Facebook, Inc. (“Facebook” or “Defendant”). Plaintiff brings this action solely in its own right, and not as a class or representative action. Plaintiff alleges the following upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon the investigation of counsel.

## INTRODUCTION

1. Facebook, a multi-billion-dollar advertising company disguised as a social media platform, is the source and cause of some of the most detrimental and largest e-commerce scams, the

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

majority of which are connected to Facebook advertisements that violate unfair competition laws, the Lanham Act, several sections of the Copyright Act, and the Patent Act.

2. Facebook publishes and displays millions of copyright- and trademark-infringing images every single day. Infringement on the site has been called both "out of control" and an online "epidemic."[1]

3. Facebook's core business function is to sell ads.[2] On its face, the site is a social media platform used to connect people online, but the social media platform is simply the means to the end. Every day, Facebook knowingly displays, publishes, controls, communicates and directs infringing, stolen images, which it has previously copied and stored, to its users through revenue generating advertisements.

4. The bulk of Facebook's billions of dollars in annual revenue comes from advertising, a practice in which Facebook actively participates through the use of algorithms that approve and deny ads based on the ads' content, human moderators that further review ads, for both legality and aesthetics prior to and after the ads are published, and other algorithms that connect ads to specific users, without the assistance or input of the advertiser.

5. Facebook makes money every time it is able to trick one of its users into clicking on a scam advertisement. This is to the direct detriment of the owners of the images and the creators and owners of the unlawfully advertised products or pieces of art.

6. Facebook infringes copyrights, trademarks, and patents, and facilitates, enables, and simplifies infringement by others, to pad its own bottom line. The social media giant uses repeat counterfeiters and infringement to the detriment of brand owners who create and market the products, packaging, and images that are used, without authorization, to advertise and sell

---

[1] Rob Price, *Facebook's Copyright Infringement Epidemic*, THE DAILY DOT (Oct. 29, 2014), https://www.dailydot.com/upstream/facebook-video-content-id-copyright-infringement/

[2] Katherine MacLang, *97% of Meta's $36.5 Billion Q1 Revenue Came from Ads*, DESIGNRUSH (May 1, 2025), https://news.designrush.com/97-percent-of-meta-total-revenue-in-q1-2024-comes-from-ads; Kamil Franek, *How Facebook Makes Money: Business Model Explained*, https://www.kamilfranek.com/how-facebook-makes-money-business-model-explained/ (last visited Oct. 26, 2026).

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

counterfeit goods on Facebook's platform. Facebook's exploitation of small and mid-sized business owners is harmful to both the survival of small businesses and the innovation the Copyright Act, the Lanham Act, and the Patent Act are designed to protect and encourage.

7. Over the last decade, Facebook has become one of the largest and fastest growing online advertisers in the world. Since its creation in 2004, Facebook's daily, monthly, and annual user base has grown by the billions.

8. Facebook's response to its growth has lacked any substantial increase in advertisement policing, a more robust takedown program in connection with the Digital Millennium Copyright Act ("DMCA") or reasonable protection of the intellectual property rights of brand owners and rights holders, such as Plaintiff (as defined herein). This is intentional because a substantial percentage of Facebook's ad revenue comes from advertisements related to counterfeit scams.

9. In typical Facebook fashion, the social media giant not only denies any responsibility for the mass infringement it perpetrates on its site but has long touted its own proactive detection capabilities. As early as 2021, Facebook claimed to be "proactively" removing "potential counterfeit or copyright infringement before it [is] reported" by rights holders, representing that it had proactively removed 99.7% of counterfeit content on Facebook and 82.8% on Instagram in the second half of 2020 alone.[3] Meta's more recent public disclosures confirm that this capability has only grown: in 2025 alone, Meta represented that it removed 159 million scam ads, 92% of them before a single user ever reported them, disabled 10.9 million accounts linked to scam centers, and deployed artificial intelligence systems capable of detecting brand and celebrity impersonation and fraudulent, spoofed websites in real time.[4] Despite this admitted, and expanding, technical capacity to detect and remove infringing and fraudulent content proactively and at massive scale, Facebook

---

[3] Mark Fiore, *How We're Proactively Combating Counterfeits and Piracy*, META (May 19, 2021), https://about.fb.com/news/2021/05/how-were-proactively-combating-counterfeits-and-piracy/

[4] Meta, *Fighting Scammers and Protecting People With New Technology and Partnerships*, Meta Newsroom (Mar. 11, 2026, updated Mar. 30, 2026), https://about.fb.com/news/2026/03/fighting-scammers-protecting-people-with-new-technology-and-partnerships/

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

continued to permit Counterfeiter Ads (defined as advertisements using Plaintiff's Registered Works and/or the Betty's Best Marks) to proliferate on its platform. Facebook was not merely failing to catch what it could not find; it declined to apply, to Plaintiff's detriment, capabilities it had already built and repeatedly publicized.

10. Facebook knows the prevalence of scams on its site. In fact, an internal Facebook report, later disclosed in November 2021 as part of the Wall Street Journal's 'Facebook Files' reporting, found that in 2018, 40 percent of its pages traffic directed users to pages that stole or recycled most of their content.[5] This number has dramatically increased since 2018.

11. That problem persists today. In its 2025 Review of Notorious Markets for Counterfeiting and Piracy, issued March 3, 2026, the Office of the United States Trade Representative ("USTR") specifically discussed Facebook and Instagram in its review of online marketplaces raising counterfeiting concerns, noting that "[s]takeholders have expressed... concerns about markets such as TikTok Shop and Meta platforms Facebook and Instagram," including concerns regarding high volumes of counterfeit products, fraudulent advertisements linking to fake websites, social media influencers promoting counterfeit goods, and a lack of adequate anti-counterfeiting policies, effective notice-and-takedown procedures, and proactive filtering tools.[6]

12. Facebook's own more recent public disclosures confirm the scale of the problem has not diminished. In April 2025, Facebook disclosed that it had removed more than 23 million profiles impersonating large content producers, and more than 100 million fake pages engaged in

---

[5] Keach Hagey & Jeff Horwitz, *Facebook Allows Stolen Content to Flourish, Its Researchers Warned*, The Wall Street Journal (Nov. 9, 2021), https://www.wsj.com/articles/facebook-stolen-content-copyright-infringement-facebook-files-11636493887 (last visited Sept. 18, 2026); Kim Lyons, *Artists Are Playing Takedown Whack-A-Mole to Fight Counterfeit Merch*, The Verge (Feb. 11, 2022), https://www.theverge.com/22924353/artists-counterfeit-merch-facebook-amazon-etsy-dmca (last visited Sept. 18, 2026).

[6] Office of the U.S. Trade Rep., *2025 Review of Notorious Markets for Counterfeiting and Piracy* (Mar. 3, 2026)

coordinated "scripted follows" abuse, in 2024 alone.[7] One year later, in March 2026, Facebook disclosed removing an additional 20 million impersonating accounts in 2025, while acknowledging that impersonation reports had fallen only 33 percent, and expressly defined "unoriginal content" to include re-uploaded posts and works with only minor edits, the same tactic Counterfeiters use to advertise stolen images and Creative Works as their own.[8]

13. Facebook's supposedly "robust" takedown program is anything but, particularly with respect to disabling who it knows to be repeat infringers. For instance, from September 1, 2021 to September 22, 2023, Plaintiff alone reported thousands of infringing ads to Facebook for violating its trademark and copyright rights through the display, distribution, derivative copying and sale of counterfeit versions of its product. On November 1, 2026, Plaintiff checked 343 Facebook pages that ran Counterfeiter Ads for the websites at issue in the Advertiser Action. 133 of them still displayed videos copied from Plaintiff's Registered Works. Facebook, despite actual and apparent knowledge of these pages/accounts' infringing behavior, allows the pages/accounts to continue using the platform to advertise counterfeit products, displaying stolen images, videos, and marks, and victimizing legitimate brand owners and rights holders such as Plaintiff.

14. Facebook has become one of the largest breeding grounds for foreign e-commerce scams. The scams generally involve third party counterfeiters ("Counterfeiters") who steal images and videos of unique products directly from business owners' websites, marketplace listings, or social media accounts (collectively, "Creative Works") and use those images and videos to advertise counterfeit products for sale on Facebook as their own, often for a heavily discounted price. This directly infringes the exclusive rights held by the owners and creators of the works and marks ("Creators") and unfairly competes with the legitimate business owners.

15. Facebook uses its more than three billion users and ad-targeting algorithms, which draw from user data that has been catalogued and categorized based upon users' likelihood to

---

[7] Meta, *Cracking Down on Spammy Content on Facebook* (Apr. 24, 2025, updated Oct. 22, 2025), https://about.fb.com/news/2025/04/cracking-down-spammy-content-facebook/.
[8] Meta, *Rewarding Original Creators on Facebook* (Mar. 13, 2026), https://about.fb.com/news/2026/03/rewarding-original-creators-on-facebook/.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

respond to ads, to entice Counterfeiters to pay for ads on the site. Facebook then uses its algorithms to directly connect Counterfeiters with victims of the Counterfeit Ads, and Facebook profits from making these connections. Without Facebook, Counterfeiters could not reach such an immense number of potential customers.

16. Through the Facebook Ad Platform, legitimate advertisers and Counterfeiters alike can be certain that their ads make it to interested consumers. If the ads are not reaching the right audience, Facebook tracks that data and provides an opportunity to monitor the directed advertisements to obtain better results, or in some cases uses its data and resources to target users without any input from the Counterfeiters.

17. Facebook uses information it collects from billions of user profiles and user selected preferences to create an inventory of data that it can exploit for ad revenue. Facebook then inputs that information into its algorithm to deliberately and knowingly direct Counterfeiter Ads to specific users who fall into certain categories, a determination Facebook makes without material input from the Counterfeiters.

18. Facebook connects Counterfeiters to Facebook users based upon the users' interests, certain statistics and user preferences. Facebook then calculates who will be most interested in the advertised products and shows those advertisements to those users. Counterfeiters do not assist Facebook in determining which Facebook users should see which advertisements; indeed, Counterfeiters never have access to this data.

19. Facebook's targeting practices are not limited to selecting among the audience a Counterfeiter identifies, as described above. Through its "Advantage+ Audience" feature, Facebook treats an advertiser's chosen targeting criteria, including interests, custom audiences, and lookalike audiences, as suggestions rather than binding limits, and its algorithm expands ad delivery to Facebook users entirely outside those criteria whenever it determines doing so will produce better results, with only the advertiser's selected location and minimum age enforced as hard constraints.[9] Accordingly, when a Counterfeiter Ad using Plaintiff's Registered Works or the Betty's Best Marks

---

[9] Meta, *About Advantage+ Audience*, Meta Business Help Center (last visited Sept. 18, 2026).

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

is not achieving the desired results, Facebook does not merely select among the audience the Counterfeiter identified, it displays the ad to Facebook users the Counterfeiter never selected and would not otherwise have reached or considered targeting. Facebook may also do this when the Counterfeiter has not spent the entirety of its proposed ad budget.

20. Infringement on Facebook, and sites like it, is harmful to both consumers and rights holders. If a Facebook user makes a purchase through a Counterfeiter's ad or linked website, the user receives a cheap knockoff of the advertised product, or nothing at all. The users pay for a product that they never receive, suffering easily cognizable damages.

21. Plaintiff had its copyrights, trademarks, and patents violated, lost out on sales, and suffered damage to the integrity and reputation of its brand. This violated its exclusive ownership rights, including display, duplication, and distribution, which are protected by statute.

22. It can be common for online service providers (in this case, Facebook) to be used as a device for scams. In fact, Congress enacted a safe harbor to protect both online service providers and rights holders. The safe harbor is the DMCA. The DMCA gives rights holders a way to have their content removed from websites that are using it without authorization. If online service providers take reasonable measures to stop copyright infringement, the DMCA also provides them with protection from liability for hosting infringing content, for which they would otherwise be liable.

23. For DMCA protection, the online service provider cannot: (1) have a role in posting the infringing material; (2) have knowledge that the content violated a copyright; and (3) profit from the infringing material. Facebook violated all three and cannot claim any DMCA protections.

24. Facebook directly facilitated infringement on its site through the storage of infringing images on its computers or systems and display of the images on its site to its users. Facebook had knowledge of the infringement on its site and profited directly from the infringement.

25. Moreover, pursuant to DMCA and to receive safe harbor protection, Facebook was required to follow certain policing guidelines to prevent copyright violations. This includes creating, implementing and reasonably enforcing a specific copyright infringement policy that includes a promise to take down any infringing content upon notification that it exists and to remove Repeat Infringers (a Facebook account, page or advertiser that a rights holder reported to Facebook as

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

violating their exclusive ownership rights (copyright or trademark) on more than one occasion). While Facebook purports to have a copyright infringement policy and a Repeat Infringer policy, it does little to implement or enforce either. If it did, Counterfeiters would go elsewhere with their scams.

26. Facebook has failed to police its site, and in some cases has profited directly from infringing and fraudulent ads placed by Counterfeiters and scammers.[10] Internal Facebook/Meta documents show that the company itself projected earning approximately $16 billion, roughly 10% of its 2024 revenue, from advertisements for scams and banned goods, including $3.5 billion every six months from ads it internally classified as posing a "higher legal risk", and that Facebook displayed approximately 15 billion such “high-risk” scam advertisements to users every day.[11] Rather than eliminating this revenue, Facebook's own internal targets called only for its gradual reduction, from 10.1% of revenue in 2024, to 7.3% in 2025, to 6% in 2026, with a target of 5.8% still projected for 2027.[12] Rather than removing suspected fraudulent advertisers, Facebook applied an internal policy of requiring 95% certainty of fraud before banning an advertiser outright; below that threshold, suspected bad actors were simply charged higher advertising rates and permitted to continue running ads.[13] Facebook's own safety personnel have internally estimated that the company is involved in as many as one-third of successful scams occurring in the United States, while Facebook forwent only approximately $135 million, about 0.15% of its revenue, to address suspicious advertising.[14] As a result, Facebook has fostered an explosion in scams and exploitation

---

[10] See also Craig Silverman, *Facebook Gets Paid*, BuzzFeed News (Dec. 10, 2021) (documenting Facebook's acceptance of ad revenue from scammers and counterfeiters notwithstanding its enforcement policies).

[11] Jeff Horwitz, *Meta Is Earning a Fortune on a Deluge of Fraudulent Ads, Documents Show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/

[12] *Id.*

[13] *Id.*

[14] *Id.*; see also Letter from Sen. Richard Blumenthal & Sen. Josh Hawley to Chair, Fed. Trade Comm'n & Chair, Sec. & Exch. Comm'n (Nov. 22, 2025) (citing Meta's internal estimate that it may be "involved" in up to one-third of successful scams reported by U.S. users, and noting Meta ignored or incorrectly rejected 96% of user fraud reports)

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

of rights holders and the billions of people who use its sites. It is Facebook's own direct infringement, its financial incentive to tolerate infringing and fraudulent advertising, and its failure to comply with basic policies and precautions, particularly relating to Repeat Infringers (as defined herein), that disqualifies the social media giant from safe harbor protection and gives rise to this action.

27. Facebook knowingly assists and encourages Counterfeiters. This is particularly true for Repeat Infringers. Rights holders can notify Facebook of a Counterfeiter's use of an infringing photograph or mark in an advertisement and, even if Facebook manages to take that ad down, more ads, using the same image or mark will pop up on the site and other sites immediately.

28. Facebook's powerful ad tools and lax enforcement helped it become the preferred platform of shady affiliate marketers that target people with scams and use false claims and infringing photographs and marks to entice users to pay for products that never arrive or are far from what was promised.

29. The stolen and infringing images and marks Facebook publishes unfairly compete with legitimate business owners and infringe copyrights and trademarks, both of which create direct liability for Facebook pursuant to Federal and State unfair competition laws, the Lanham Act, the Copyright Act, and the Patent Act. Facebook is also contributorily and vicariously liable for its facilitation, enablement, and simplification of infringement by others, to pad its own bottom line.

30. This is a complaint for the violations of various Federal and State unfair competition laws and intellectual property laws arising from Facebook's use of stolen images for ad revenue and direct infringement of Plaintiff's exclusive right to display and distribute Registered Works, and Facebook's participation, and contributions to, the advertising and sale of creative works and products that constitute inferior knockoff duplications of Plaintiff's copyrighted, trademarked, and patented products.

31. Plaintiff seeks monetary, declaratory, and injunctive relief against Facebook for its direct, contributory, and vicarious copyright infringement; trademark infringement and counterfeiting, contributory and vicarious trademark infringement, and false designation of origin in

violation of the Lanham Act (15 U.S.C. §§ 1114 and 1125(a)); design patent infringement (35 U.S.C. §§ 271 and 289); and unfair competition under California common law and statute.

## PARTIES

32. Betty's Best, Inc. is, and at all relevant times was, a California Corporation with its principal place of business in Santa Ynez, California.

33. Betty's Best is the maker of the StripHair Gentle Groomer, a therapeutic multi-purpose grooming tool for horses and pets, sold under the federally registered trademarks STRIPHAIR and THE GENTLE GROOMER (collectively, the "Betty's Best Marks"). The StripHair Gentle Groomer is made in the United States.

34. Betty's Best takes its name from "Betty," the brand persona of its founder Sarah Owen, who created the StripHair Gentle Groomer. Betty appears on Plaintiff's genuine packaging and in Plaintiff's videos and photographs as the identifiable face of the brand. Plaintiff used the Betty persona, including a quotation attributed to Betty, on its website and on its Facebook page, which had more than 80,000 followers. Plaintiff advertised the StripHair Gentle Groomer as made in the United States.

35. Betty's Best's products are sold through hundreds of authorized retailers in the United States and other countries, through its own website at https://striphair.com, through Amazon.com, and through other authorized retailers.

36. Betty's Best owns the Betty's Best Marks, copyrighted product photographs and videos, and a design patent, described more fully below, that are the subject of this action.

37. Multiple Counterfeiters, through various Facebook pages, accounts, and linked e-commerce storefronts, stole images and videos of Plaintiff's copyrighted Works including those featuring Plaintiff's founder and former President Sarah Owen, and/or copied or confusingly imitated the Betty's Best Marks, and posted those images and marks in infringing Facebook advertisements. The Counterfeiters removed Plaintiff's identifying marks from certain of the images used in such ads and advertised knock-off versions of Plaintiff's products as their own, for a

SRIPLAW
California ◆ Florida ◆ Georgia ◆ Indiana ◆ New York ◆ Tennessee

significantly discounted price. Those Counterfeiters included the Facebook Advertisers (defined below).

38. Additionally, Facebook blocked Plaintiff's own ads on all three of its ad accounts on or around October 10, 2021, stating "you have infringed on someone's rights or broken the law and are no longer allowed to advertise on Facebook" without further explanation. At that time Facebook continued to approve and run Counterfeiter Ads that used Plaintiff's own videos. Facebook also disabled the support button in Plaintiff's Ads Manager account for as long as the ad accounts were disabled. Plaintiff appealed the decision repeatedly. In each appeal, Plaintiff stated that it owned the trademark, copyright, and patent rights at issue, that its brand and intellectual property had been taken over in a way that deceived Facebook users into falling for the scam, and that Plaintiff was submitting trademark and copyright reports. This devastated Plaintiff's business because it relied on Facebook ads for the promotion and sale of Plaintiff's products. Despite Plaintiff's repeated attempts to address the issue with Facebook and reestablish its ad accounts, it was not until January 2024 when Plaintiff was able to reinstate one out of the three ad accounts.

39. Facebook, the site that makes this scamming possible, is a publicly traded Delaware corporation with its principal place of business at 1 Hacker Way, Menlo Park, California 94025. On October 28, 2021, CEO Mark Zuckerberg introduced "Meta" (Meta Platforms, Inc.), which combines all Facebook-owned applications and technologies under one company brand. Meta is headquartered at 1 Hacker Way, Menlo Park, California 94025, and has offices in more than 90 cities worldwide.[15]

40. At all times relevant, Facebook was and continues to be engaged in the business of advertising and selling goods on its platforms, together with third-party advertisers, many of which are Counterfeiters. Facebook's largest source of income is advertisement revenue.

---

[15] Meta Platforms, Inc., Annual Report (Form 10-K) for the fiscal year ended December 31, 2025 (filed 2026)

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

## JURISDICTION, VENUE AND CHOICE OF LAW

41. This action is for, and related to, copyright, trademark, and design patent infringement and unfair competition, and arises under the Copyright Act of the United States (17 U.S.C. § 101, et seq.), the Lanham Act (15 U.S.C. § 1051, et seq.), and the Patent Act (35 U.S.C. § 1, et seq.), by virtue of Defendant's direct infringement of the rights of Plaintiff, along with Defendant's inducement and encouragement of, and material contributions to, the unauthorized display, distribution, and creation of derivative works embodying Registered Works owned and/or controlled by Plaintiff, the unauthorized use of the Betty's Best Marks, the infringement of the HOPGT Design Patent, and Defendant's false designations of origin.

42. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b), and 15 U.S.C. § 1121, because this action arises under the Copyright Act, the Lanham Act, and the Patent Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state-law claims asserted herein because they are so related to the federal claims that they form part of the same case or controversy.

43. This Court has personal jurisdiction over Facebook because it transacts business in this State, maintains its principal place of business in this District, and because the conduct alleged in this Complaint occurred in, was directed from, and/or emanated from California.

44. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(a) because Facebook is headquartered in this District, conducts business transactions in this District, and because the wrongful conduct giving rise to this case occurred in, was directed from, and/or emanated from this District.

45. This action should be assigned to the San Francisco Division of this Court since a substantial part of the events giving rise to the claims occurred in counties within this Division, to wit: Facebook's offices are in San Mateo County; notice of infringement was sent to San Mateo County; and the inducement occurred in San Mateo County.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

**DEFINITIONS**

46. "Creators" are defined for purposes of this Complaint as individuals or businesses that create, own, and/or hold registered intellectual property rights, including copyrights and trademarks, in original works of authorship and/or source-identifying marks used in connection with their goods, including Plaintiff.

47. "Creative Works" are defined for purposes of this Complaint as original works designed and fixed by a Creator, including Plaintiff's copyrighted photographs, videos, and website content, and the Betty's Best Marks used in connection with Plaintiff's products.

48. "Registered Owners" are defined for purposes of this Complaint as the owner of a copyright or trademark that has been registered with the United States Copyright Office or United States Patent and Trademark Office, respectively, including Plaintiff.

49. "Registered Works" are defined for purposes of this Complaint as copyrights that have been registered with the United States Copyright Office prior to the infringement or within three months of publication, including Plaintiff's copyrighted product photographs, videos, and website text described below.

50. "Counterfeiters" are defined for purposes of this Complaint as persons who unlawfully use images of Creative Works or Registered Works, and/or the Betty's Best Marks, or that depict goods embodying the HOPGT Design Patent (defined below), in Facebook advertisements to advance e-commerce counterfeiting scams.

51. "Counterfeiter Ads" are defined for purposes of this Complaint as advertisements that unlawfully use images of Creative Works or Registered Works, and/or the Betty's Best Marks, or depict goods embodying the HOPGT Design Patent, to advance e-commerce scams.

52. "Repeat Infringer" is defined for purposes of this Complaint as a Facebook advertiser that a Creator or Registered Owner reported to Facebook as violating exclusive ownership rights on more than one occasion.

53. "Advertiser Action" is defined for purposes of this Complaint as *Betty's Best, Inc. v. The Facebook Advertisers Listed on Schedule A*, Case No. 3:23-cv-04716-JSC (N.D. Cal.), which Plaintiff filed on September 13, 2023.

54. "Facebook Advertisers" are defined for purposes of this Complaint as the advertisers identified on Schedule A to the complaint in the Advertiser Action. A true and correct copy of that Schedule A ("Schedule A") is attached as **Exhibit 6**.

55. "SDFL Action" is defined for purposes of this Complaint as Betty's Best, Inc. v. The Individuals, Partnerships, and Unincorporated Associations Identified on Schedule "A", Case No. 1:23-cv-22322-DSL (S.D. Fla.).

56. "Relevant Period" is defined for purposes of this Complaint as the period from at least 2021 until the filing of this Complaint. Unless otherwise stated, the conduct alleged in this Complaint occurred during the Relevant Period.

## FACEBOOK TERMS AND CONDITIONS

57. Facebook has several policies, terms of use, and rules, including a Terms of Service, Commercial Terms, and Facebook Advertising Terms and Conditions. All of these internal policies require both Facebook and its users and advertisers to comply with relevant laws.

***Terms of Service***

58. According to Facebook's Terms of Service, Facebook does not charge its users to use the site. Instead, businesses and organizations, including Counterfeiters, pay Facebook for running advertisements. Facebook uses the personal data of its users to determine which ads to show them.

59. The Terms of Service bar Facebook users from using any of Facebook's products to do or share anything that: (1) violates the Terms, Community Standards, and other terms and policies that apply to use of its products; (2) is unlawful, misleading, discriminatory, or fraudulent; or (3) infringes or violates someone else's rights, including their intellectual property rights. If a user violates the Terms of Service, Facebook can remove or restrict access to content.

60. Specifically, Facebook's Terms of Service states that if Facebook determines a user has clearly, seriously, or repeatedly breached its Terms or Policies, including its Community Standards, it may suspend or permanently disable access to that user's account, including for repeated infringement of other people's intellectual property rights.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

***Commercial Terms***

61. The Commercial Terms apply if a user accesses or uses Facebook products for any commercial or business purpose, including advertising, and require users to represent and warrant that their access or use of Facebook for business or commercial purposes complies with all applicable laws, rules, and regulations.

***Facebook Advertising Terms and Conditions***

62. The Facebook Advertising Terms and Conditions specify what types of ad content are allowed on the site, including Facebook's Copyright Infringement and Repeat Infringer policies.

63. Facebook's copyright infringement policy states:

> Ads must not contain content that infringes upon or violates the rights of any third party, including copyright, trademark, privacy, publicity, or other personal or proprietary rights.
>
> Advertising Policies: Prohibited Content, Section 9

64. Facebook's repeat infringer policy states:

> In addition to removing content and bad actors when they are reported, Facebook disables the accounts of repeat infringers where appropriate, and takes other actions before someone can become a repeat infringer, such as imposing temporary feature limits or removing access to certain product features.
>
> Repeat Infringer Policy[16]

65. Facebook's Advertising Standards likewise prohibit "Third-Party Infringement." They state:

> Ads may not contain content that infringes upon or violates the intellectual property rights of any third party, including copyright, trademark or other legal rights. This includes, but is not limited to, the promotion or sale of counterfeit goods, such as products that copy the

---

[16] How Meta Helps Protect Against Counterfeits, https://www.facebook.com/business/tools/anti-counterfeiting/guide (last visited Sept. 24, 2026); *see also About Brand Rights Protection*, Meta Business Help Center, https://www.facebook.com/business/help/828925381043253 (last visited Sept. 25, 2026); *supra* note 10.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

> trademark (name or logo) and/or distinctive features of another company's products to imitate a genuine product.
>
> Meta Advertising Standards, Intellectual Property Infringement, Third-Party Infringement (**Exhibit 8** attached hereto)

66. Facebook's Advertising Standards also state that Facebook's "policies require all advertisers to comply with the laws in their jurisdiction." Every Counterfeiter Ad violated these standards. Facebook nonetheless approved, published, and profited from the Counterfeiter Ads.

67. Facebook violated, and continues to violate, its Terms of Service, Commercial Terms, Advertising Terms, and Advertising Standards through the conduct described herein.

## FACTUAL ALLEGATIONS

### *I. Creators and Registered Owners Have Exclusive Ownership Rights in Their Creative Works.*

68. Creative Works are protected by copyright laws, including but not limited to the Copyright Act, when they are affixed in tangible form (such as a photograph or video), and source-identifying marks such as the Betty's Best Marks are protected under the Lanham Act and common law.

69. The owner of a Creative Work has exclusive rights to do or authorize: (1) reproduction of the work in copies; (2) preparation of derivative works; (3) distribution of copies of the work to the public for sale or other transfer of ownership; (4) performance; and (5) display[17]. A trademark owner likewise has the exclusive right to use its marks in commerce and to prevent others from using confusingly similar marks or false designations of origin. Anyone who violates these exclusive rights is an infringer, whether or not the Creator has registered its Creative Works or marks.

[17] 17 U.S.C. § 106.

SRIPLAW

CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

***II. Facebook Is Directly Violating Rights Holders' Ownership Rights and Also Helping Counterfeiters Violate Those Rights.***

70. Counterfeiters locate and target small and mid-sized businesses selling unique, branded consumer products. Once a Counterfeiter locates a product it wants to rip off, it steals images and marks from the Creator's or Registered Owner's website, marketplace listing, or social media account and uses Facebook, which acts collaboratively with Counterfeiters and on its own, to display and distribute those images and marks to Facebook users.

71. Counterfeiters have more success swiping images and marks from small and mid-sized businesses because those businesses' original websites may be easily copied, making it more difficult for customers to discern the actual source. The Counterfeiters' use of the rights holder's original photographs and marks adds to the confusion. Counterfeiters also add trust and security badges to their landing pages and copy legitimate customer reviews of the genuine product from the rights holder's website and from sites such as Google and Amazon. Additionally, small and mid-sized businesses may not have the resources to fight fraud on a large scale, a fact that Facebook knows and exploits when it ignores takedown notices from rights holders.

72. The Counterfeiter websites to which Facebook advertisements often direct consumers appear legitimate to the average consumer. They often have terms of service and a privacy policy, functional shopping carts and checkout pages, customer reviews, and accept various payment methods[18]. However, many such websites are populated with images and marks stolen from legitimate brand owners and offer only knockoff products, or in many cases no product at all, existing solely to harvest consumers' payment and personal information.[19] These are not isolated bad actors, but coordinated, large-scale networks: one recently identified network alone comprised more than 20,000 fake shop domains hosted on just 36 IP addresses, with Facebook identified as one of

---

[18] Andrew R. Chow, Here's How Shopping Scams on Facebook Are Ripping Off Thousands of Customers, With the Money Flowing Overseas, TIME (Dec. 19, 2020, 07:02 AM ET), https://time.com/5921820/facebook-shopping-scams-holidays-covid-19/ (last visited Sept. 24, 2026)

[19] *Id.*

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

the two primary social-media platforms used to drive traffic to such sites.[20] Another such network used as many as 100 Facebook advertisements per day to direct consumers to a single fraudulent website, ultimately encompassing 608 fake websites impersonating legitimate brands.[21]

73. Some Counterfeiters set up Facebook pages to sell the stolen products, adding to the appearance of legitimacy because small businesses regularly market their products on social media sites. The Counterfeiter Ads direct Facebook users to click on a link to a Facebook page or third-party website where the counterfeit product can be purchased. Several such Counterfeiter Facebook pages, created and controlled by Counterfeiters, remain active on the site even after rights holders report the pages to Facebook.

74. Facebook allows Counterfeiters to use its ad platform to advertise counterfeit products with stolen images and marks hundreds to thousands of times over short periods, sometimes referred to as “ad blasts” or “scam blasts.” This makes it difficult for Registered Owners to keep track of the infringement, and Facebook does little to stop it, including ignoring Repeat Infringers who use the same account name, page, or variations of the same company/account names to advertise and sell counterfeit products over and over again.

75. Counterfeiters who violate a rights holder’s exclusive rights under the Copyright Act, Lanham Act, and Patent Act frequently maintain active pages and accounts on Facebook, even after being reported, and remain able to use the ad platform to advertise counterfeit products, generating continued revenue for Facebook from those Repeat Infringers.

***III. The Rise of Scamming and Facebook’s Prioritization of Revenue Over the Rights of Users and Rights Holders.***

76. E-commerce and social-media fraud are among the fastest-rising categories of online crime. A customer might order a certain product or service through a social media advertisement and

---

[20] Stefan Dasic, Inside a Network of 20,000+ Fake Shops, Malwarebytes (Mar. 18, 2026), https://www.malwarebytes.com/blog/scams/2026/03/inside-a-network-of-20000-fake-shops.
[21] Facebook Ads Lead to Fake Websites Stealing Credit Card Information, The Hacker News (Aug. 1, 2024), https://thehackernews.com/2024/08/facebook-ads-lead-to-fake-websites.html (reporting on Recorded Future's identification of the "ERIAKOS" scam network).

receive a knockoff, a damaged product, or nothing at all. Online shopping scams are consistently among the most-reported categories of fraud tracked by the Federal Trade Commission ("FTC").

77. Social media sites, like Facebook, have created such an advertiser-friendly environment that the sites have become feeding grounds for scam artists.

78. According to the FTC's Consumer Sentinel Network data, consumers reported losing $2.1 billion to scams that began on social media in 2025, more than eight times the $261 million in losses reported in 2020[22], and nearly 30% of all reported scam-loss dollars that year, up from $789 million in 2021, $1.2 billion in 2022, $1.5 billion in 2023, and $1.9 billion in 2024.[23] The year-over-year growth in reported losses is reflected below.




79. The FTC found that in 2025 people reported losing more money to scams that started on Facebook than on any other social media platform, with WhatsApp and Instagram (both owned by Meta) a distant second and third, and that reported losses beginning on Facebook alone exceeded reported losses to scams that began by text message or email combined.

[22] FTC Press Release, New FTC Data Show People Have Lost Billions to Social Media Scams (Apr. 2026)

[23] FTC, Data Spotlight, Reported Losses to Scams on Social Media Are Eight Times Higher Than in 2020 (Apr. 2026)



SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

80. Shopping scams were the most frequently reported category of social media fraud reported to the FTC. Over 40% of people who reported losing money to a scam that began on social media said they were purchasing an item advertised on the platform, with products ranging from apparel and cosmetics to vehicle parts and animals, and many of the advertisements directing consumers to fraudulent or brand-impersonating websites, consistent with the Counterfeiter Ad scheme alleged herein.

81. The FTC also reported that investment scams accounted for $1.1 billion in losses (over half of all reported social-media scam losses) and that nearly 60% of romance-scam victims reported their scam began on social media, resulting in $298 million in reported losses, underscoring the scale of fraud that Facebook's advertising ecosystem enables. Social media ranked as the leading fraud-contact method, by aggregate reported losses, for every age group under 80.

82. Counterfeiters use Facebook to blast out targeted advertisements, posting hundreds to thousands of ads in just a few days. Facebook does little to confirm ownership or authenticity of the photos, marks, or products advertised, despite the readily accessible ability to do so, which gives Counterfeiters an incentive to use the site. If Facebook takes a Counterfeiter ad down, the Counterfeiters resubmit new ads almost immediately, leaving no gap in the exploitation.

83. Communities dedicated to reporting Counterfeiter Ads have grown in response to this problem, but members of these communities report that their complaints are often ignored or overruled, with Facebook representatives deeming the ads/pages within community standards. In some instances, Facebook has responded to complaints from these scam-policing groups by shutting down the group's own Facebook page or account, instead of addressing the fraud the group identified and reported. Facebook also blocked Plaintiff’s ability to warn consumers: with its ad accounts disabled, Plaintiff could not use Facebook advertising to inform consumers about the Counterfeiter Ads.

84. Facebook prioritizes revenue over rights holders, the safety of its billions of users, the public good, and the integrity of its own platform. The consequences vary: consumers are sold knockoff goods or goods they never receive; legitimate advertisers' accounts or pages are hacked and used to peddle knockoff or non-existent goods; and rights holders and legitimate brand owners are

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

forced to divert resources to policing infringement or are driven out of business. All the while, Facebook banks the ad revenue.

85. Facebook relies on a comparatively small number of contractors to manage a daily onslaught of ad moderation and policy enforcement decisions that have far-reaching consequences for users and rights holders. According to public reporting, Facebook ad workers have at times been directed to focus enforcement on conduct that would result in financial losses for Facebook, while the company pushes to grow revenue in regions associated with many such scams.[24] In fact, instead of removing repeat infringers, Facebook allows some to accrue more than 500 strikes without ever being shut down because the more strikes a bad actor accrues, the more Facebook will charge them to run ads.[25]

86. Facebook's scheme, which denied Plaintiff the ability to protect its Creative Works and Registered Works while simultaneously generating traffic and advertising revenue from infringing ads, constituted direct infringement, inducement of infringement, contributory infringement, and vicarious infringement, making Facebook liable to Plaintiff for damages for each work infringed by each Counterfeiter ad, and additionally liable for violations of unfair competition laws, the Lanham Act, and the Patent Act.

### *IV. Facebook Generates a Substantial Portion of Its Revenue from Advertisements.*

87. There are millions of small, medium, and large businesses on the Facebook platform trying to reach the company's billions of monthly active users. Facebook makes money by auctioning off space for ads within Facebook and Instagram users' feeds and stories.[26]

---

[24] Ashley Belanger, *Bombshell report exposes how Meta relied on scam ad profits to fund AI*, ARS TECHNICA, https://arstechnica.com/tech-policy/2025/11/bombshell-report-exposes-how-meta-relied-on-scam-ad-profits-to-fund-ai/, (Nov. 6, 2025),
[25] *Id.*
[26] Kamil Franek, *supra* note 2..

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

88. Facebook has data about whom its users communicate with, what content its users consume and react to, and what pages and apps its users visit outside of Facebook's own apps.[27] Facebook uses algorithms that estimate personal profiles and categorize its users based on granular statistics to target advertisements from third parties to a specific, revenue-generating audience.

89. Millions of advertisers use Facebook's ad platform, the substantial majority of which are legitimate small businesses, though a meaningful subset, are Counterfeiters.[28]

***V. Advertising on Facebook – How It Works.***

90. Facebook entices advertisers, including Counterfeiters, to use its ad platform through its large user base, marketing to advertisers that it can help them reach whatever audience they are looking for."[29]

91. Facebook also promises, through use of its mass data catalogue and advertisement-targeting algorithm, to connect advertisers to users that are more likely to pursue the advertised good or service, automatically showing ads to people most likely to find relevant.[30] The advertisers never have access to Facebook user information; Facebook takes care of connecting the advertiser to the user.

92. There are several basic steps to set up an advertisement on Facebook. First, advertisers select an objective from Meta's current set of six campaign objectives: Awareness, Traffic, Engagement, Leads, App Promotion, or Sales.[31] Second, the advertiser selects an audience, and Facebook reassures the advertiser that it will direct ads to consumers who will find the ads most relevant. Third, the advertiser decides where to run the ad, Facebook, Instagram, Messenger,

---

[27] Chyelle Dvorak, *What Data Does Facebook Collect*, REVIEWS.ORG, https://www.reviews.org/internetservice/what-data-does-facebook-collect/ (last visited Sept. 18, 2026)
[28] Kamil Franek, *supra* note 2.
[29] *See Meta Ads: Start Advertising on Facebook, Instagram, Messenger and WhatsApp*, META FOR BUSINESS, https://www.facebook.com/business/ads (last visited Sept. 25, 2026).
[30] *Ad Targeting*, https://www.facebook.com/business/ads/ad-targeting, META (last visited Sept. 18, 2026)
[31] *Choosing Ads Manager Advertising Objectives*, Meta Business Help Center, https://www.facebook.com/business/help/1438417719786914 (last visited Sept. 25, 2026).

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

Threads, WhatsApp, or Audience Network.[32] Fourth, advertisers set a budget. Facebook has represented that if it is not able to get the advertiser the results it is seeking, it will stop delivering the ad and will not charge for it; however, Facebook has since revised this policy to clarify that any such decision is made at Facebook's sole discretion and without admission of liability.[33]

93. Facebook's "Traffic" objective, which includes what Facebook refers to as "link clicks" advertising and directs users off Facebook to a linked website, remains among the most economical ways to advertise on the platform, and is frequently the objective Counterfeiters select for their fraud ads, using low-cost, per-click advertising to direct Facebook users to Counterfeiter websites where stolen images and marks are also displayed.[34]

94. The fifth step in setting up an advertisement is to pick a format (photo ad, video ad, story ad, etc.). Advertisements that include images are reviewed by Facebook for compliance with its advertising standards and, in some cases, legality. Facebook controls the ad review process, including what images are published on the platform, through both automated and human review before and after ads are published.[35]

95. After the advertiser completes the setup steps, Facebook runs an “ad auction” that determines which of the eligible ads is shown to a given user, based on factors including bid, estimated action rates, and ad quality. Facebook continues to monitor ads after they are published for results, including making adjustments to the users receiving the ads.

---

[32] *About Ad Placements Across Meta Technologies*, Meta Business Help Center, https://www.facebook.com/business/help/407108559393196 (last visited Sept. 25, 2026).
[33] *About Refunds*, Facebook.com, https://www.facebook.com/business/help/626428078224265?id=1468738389987593 (last visited Sept. 25, 2026).
[34] *Traffic Campaigns*, Meta Business Help Center, https://www.facebook.com/business/help/1438417719786914 (last visited Sept. 25, 2026); *see also supra* note 31 (discussing Meta's current advertising objectives).
[35] *Introduction to the Advertising Standards*, Meta Transparency Center, https://transparency.meta.com/policies/ad-standards/ (last visited Sept. 25, 2026).

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

### *VI. Facebook's Infringement of Plaintiff's Intellectual Property Rights.*

#### *A. Plaintiff's Trademark Rights*

96. Plaintiff created and sells unique, patented grooming tools under the federally registered trademarks STRIPHAIR and THE GENTLE GROOMER (collectively, the "Betty's Best Marks"), including the first multi-purpose grooming tool of its kind, known as the "6-in-1 Shedding Grooming Massage brush," for horses and pets, which can be used to shed, groom, shine, shampoo, scrape, and massage.

97. Plaintiff is the owner of all rights in and to the Betty's Best Marks for "grooming tools for pets, namely, combs and brushes; currycombs" in International Class 21, as shown in the table below.

| Mark | Reg. No. | IC | First Use | First Use in Commerce | Reg. Date | Exhibit |
|---|---|---|---|---|---|---|
| STRIPHAIR | 5072866 | 21 | 10/01/2014 | 12/16/2014 | 11/01/2016 | 1A |
| THE GENTLE GROOMER | 5328641 | 21 | 2015 | 2015 | 11/07/2017 | 1B |

98. The Betty's Best Marks are valid and registered on the Principal Register of the United States Patent and Trademark Office and shown in **Composite Exhibit 1**. The Betty's Best Marks are incontestable. Images of Plaintiff's genuine StripHair Gentle Groomer products and packaging, which bear the Betty's Best Marks, are attached as **Exhibit 9**.

99. The Betty's Best Marks are used in connection with the manufacture and distribution of Plaintiff's high-quality, patented grooming tools, and are displayed directly on Plaintiff's products and packaging.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE







100. The Betty's Best Marks have been used in interstate commerce to identify and distinguish Plaintiff's products for an extended period of time, have never been assigned or licensed to Facebook or to any Counterfeiter, and are a symbol of Plaintiff's quality goods, reputation, and goodwill.

101. Plaintiff has expended substantial time, money, and other resources developing, advertising, and otherwise promoting the Betty's Best Marks. As a result of Plaintiff's efforts, members of the consuming public readily identify merchandise bearing the Betty's Best Marks as high-quality, unique, patented grooming tools sponsored and approved by Plaintiff, and the Betty's Best Marks have achieved secondary meaning as identifiers of Plaintiff's products. Plaintiff's marketing and promotional investments averaged more than $225,000 per year, and sales of products bearing the Betty's Best Marks generated approximately $1.6 million in 2021.

### B. *Plaintiff's Copyright Rights*

102. Plaintiff advertises, markets, promotes, and sells its products under the Betty's Best Marks using photographs, videos, and website content that are protected by copyright and registered with the United States Copyright Office and feature Plaintiff's former President and founder Sarah Owen as the "Betty" creator that guarantees the products' quality (collectively, the "Works").

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

103. Plaintiff's product photographs are duly registered with the Register of Copyrights as visual materials as shown in the table below. True and correct copies of the Certificates of Registration and the photographs they apply to are attached hereto as **Composite Exhibit 2**.

| **Copyright Title and Description** | **Reg. No.** | **Reg. Date** | **Exhibit** |
|---|---|---|---|
| StripHair Product Pictures 2020 (group of 10 photographs) | VA 2-299-367 | 05/12/2022 | 2A |
| StripHair Product Pictures 2019 (group of 7 photographs) | VA 2-300-902 | 05/19/2022 | 2B |
| StripHair Product Pictures 2018 (group of 2 photographs) | VA 2-304-928 | 06/03/2022 | 2C |
| StripHair Product Pictures 2021 (group of 8 photographs) | VA 2-304-931 | 06/03/2022 | 2D |

104. Plaintiff's videos are duly registered with the Register of Copyrights as entire motion pictures as shown in the table below. True and correct copies of the Certificates of Registration are attached hereto as **Composite Exhibit 3**.

| **Copyright Title and Description** | **Reg. No.** | **Reg. Date** | **Exhibit** |
|---|---|---|---|
| SH-Video-1 11.01.2019 (entire motion picture) | PAu 4-142-655 | 06/14/2022 | 3A |
| SH-Video-2 4-01-2021 (entire motion picture) | PAu 4-142-666 | 06/14/2022 | 3B |
| SH-Video-3 7.01.2021 (entire motion picture) | PAu 4-143-928 | 06/30/2022 | 3C |
| SH-Video-4 4.01.2018 (entire motion picture) | PAu 4-143-929 | 06/30/2022 | 3D |
| SH-Video-5 3.01.2019 (entire motion picture) | PAu 4-145-045 | 07/14/2022 | 3E |
| SH-Video-7 6.01.2020 (entire motion picture) | PAu 4-145-360 | 07/19/2022 | 3F |
| SH-Video-8 5.01.2021 (entire motion picture) | PAu 4-145-361 | 07/19/2022 | 3G |
| SH-Video-6 2.01.2019 (entire motion picture) | PAu 4-145-379 | 07/19/2022 | 3H |

105. Plaintiff's website content, comprising photographs and text titled “striphair.com website,” is duly registered with the Register of Copyrights under Registration No. VA 2-271-013, effective October 6, 2021. A true and correct copy of the Certificate of Registration and the content it applies to is attached hereto as **Exhibit 4**.

106. The copyrighted photographs, videos, and website content depict Plaintiff's high-quality, patented grooming tools' design features, packaging, and use on horses and pets from different perspectives, and are used by Plaintiff and its authorized retailers to legitimately advertise

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

and promote Plaintiff's genuine products. Plaintiff has never authorized anyone to advertise, market, or promote unauthorized goods using its copyrighted photographs, videos, or website content.

107. These copyrighted photographs, videos, and website text are Plaintiff's “Registered Works” for purposes of this Complaint.

108. Videos featuring Betty, with the StripHair name and a statement that the product is made in the USA, were Plaintiff’s best-performing Facebook advertising videos since 2018. Plaintiff stored those videos, and the ad campaigns built on them, in its own Facebook ad accounts, in Facebook’s Ads Manager media library. Facebook’s own records therefore showed that Plaintiff created those videos and had been running them in its ads.

109. Most of Plaintiff’s videos end with a close-up of the tool and the statement “Made in USA,” with Plaintiff’s version of a U.S. flag. One of Plaintiff’s marketing images also shows a U.S. flag and the words “Made in America.” Plaintiff’s StripHair product box shows Betty, in a 1950s style, standing next to a horse and holding up the tool in a presenting pose. The Counterfeiters sold the counterfeit product in a white box of the same size, with an exact copy of that image of Betty and the horse on the front. Images of Plaintiff’s products, packaging, and marketing images, including an image of Betty that the Counterfeiters copied frequently, are included in **Exhibit 9**. A photograph of a counterfeit box is attached as **Exhibit 10**.

### *C. Plaintiff’s Design Patent*

110. Plaintiff's grooming tools' design features are protected under a design patent registered with the United States Patent and Trademark Office as U.S. Patent No. D841,900 S, titled “Horse or Pet Grooming Tool” (the “HOPGT Design Patent”), registered February 26, 2019, which has not expired and is valid. Plaintiff marked its products with a patent notice and has never granted authorization to anyone to import, make, use, or sell unauthorized goods using the HOPGT Design Patent. A true and correct copy of U.S. Design Patent Registration is attached hereto as **Exhibit 5** (the “HOPGT Design Patent”).

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

### D. *Facebook's Infringement of Plaintiff's Registered Works, the Betty's Best Marks, and the HOPGT Design Patent*

111. Beginning in 2021, Counterfeiters used Plaintiff's copyrighted photographs and videos of the StripHair Gentle Groomer, counterfeit and confusingly similar imitations of the Betty's Best Marks, and images of the design claimed in the HOPGT Design Patent in Counterfeiter Ads that Facebook published, displayed, and distributed to Facebook users. The Counterfeiter Ads directed consumers to Facebook pages and linked e-commerce storefronts that sold unauthorized, counterfeit knockoffs of Plaintiff's products.

112. Plaintiff documented the Counterfeiter Ads in Schedule A. For each Facebook Advertiser, Schedule A identifies the Facebook Page name, Page link, and Page ID number, the website linked from the Page, and the counterfeit landing page. For each Counterfeiter Ad, Schedule A identifies the Facebook Ad Library link and the Facebook Ad ID number.

113. Schedule A identifies hundreds of discrete Facebook Advertisers and thousands of Counterfeiter Ads. Each Counterfeiter Ad received a unique Facebook Ad ID number when it was created. Facebook approved, published, and delivered each one to Facebook users in return for payment. Plaintiff found and reported more than 600 different Facebook Page names. Most Pages linked to a website with a domain name that matched the Page name, but some Pages shared a common ad-linked website page with one of the high-infringing Facebook Advertisers. All ads were promoting the counterfeit product using the Plaintiff's video, and linked to a website selling the counterfeit.

114. Screenshots of Counterfeiter Ads, showing the Facebook Advertisers' use of Plaintiff's Registered Works, the Betty's Best Marks, and the HOPGT Design Patent, are attached as **Exhibit 7**.

115. The Facebook Advertisers created multiple versions of the Counterfeiter Ads and altered Plaintiff's videos by changing their length, speed, text overlay, or music. Each Counterfeiter Ad linked to a website page with an active shopping button. Those pages showed further uses of the Betty's Best Marks, the Registered Works, and the HOPGT Design Patent.

116. The footage in the Counterfeiter Ads was Plaintiff's footage. The Counterfeiters added no new footage. Each version of a Plaintiff video that they used was an unauthorized copy, or an unauthorized derivative work, of a Registered Work.

117. Facebook's Ads Manager prompts advertisers to create variations of an ad, such as different text, thumbnails, video length, music, or orientation, and states in its ad setup that variations can increase an ad's reach and help the advertiser meet its objective. Facebook reviewed and approved variations of the Counterfeiter Ads, including variations of videos that Plaintiff had already reported.

118. The Counterfeiters changed their ads in stages. At first, the Facebook page name on hundreds of ads was the only element that differed from the Plaintiff's currently running ads featuring Betty, using the trademark names, Betty's trust statement, and the Plaintiff's top sales-driving video. All ad-linked landing pages were an exact copy of the Plaintiff's copyrighted website page used as an ad landing page, including Made in USA claim and the Betty trust statement. Their objective was to confuse and deceive Facebook ad viewers into buying their counterfeit, and based on the comments they were successful. Then there was a clear shift in strategy that was carried out by Counterfeiters in Facebook ads first, then in marketplaces like Amazon. They began to use an image, called a thumbnail, that would show as a stagnant image on top of Plaintiff's video before auto-playing with viewing scrolling action. The image used was either the copyrighted feature-photo of Betty using the patented tool on a horse's face, or it was an image a horse with Plaintiff's patented tool prominently featured. All Facebook ad copy or thumbnail image in Counterfeiter ads used the Plaintiff's full product name minus the trademarked names. This product naming matched the Plaintiff's longstanding website and best-seller Amazon title from 2018 and was used by the Counterfeiters to name all Facebook ad-linked landing pages and over 10 marketplace listings to drive Counterfeit sales in the US and globally, while diverting sales from the Plaintiff's legitimate product. Some Counterfeiters changed up their ads in the third stage by not using any ad copy, but still using copyright-infringing images of the patented product and/or Betty, and using the product name on top of the image or video was done to avoid detection in the Facebook Ad Library or Brand Rights Protection search tools, and avoid being reported for copyright infringement. All

Counterfeiter ads, in all stages, included 100% Plaintiff-created copyrighted video footage featuring Betty, and the ad-linked landing pages used the Plaintiff's product name and copyrighted product descriptions, to lead consumers to believe that the invention, design, and U.S. manufacture of the product were the Counterfeiters' own.

119. The websites that the Counterfeiter Ads linked to copied the text and product photographs from Plaintiff's website, including photographs taken from Plaintiff's videos, and some displayed a quotation attributed to Betty. Some showed an exact copy of the image of Plaintiff's product packaging, which shows Betty. The websites also displayed trust and security badges and customer reviews of the StripHair Gentle Groomer that were copied from Plaintiff's website, Google, and Amazon. The counterfeit products were of lower quality than Plaintiff's genuine goods and did not perform as shown in Plaintiff's videos. Customers who reviewed the counterfeit products on Amazon described them as poor quality. One reviewer who knew the StripHair brand told other consumers that Plaintiff's price was worth the quality, and another noted that the video showed a flexible tool while the counterfeit tool was stiff and could not bend. The Counterfeiters thereby made Betty appear to have made false claims, which is the opposite of Plaintiff's brand message.

120. The Facebook Advertisers were located in China. They promoted counterfeit products at an average price about 50% lower than the price of Plaintiff's genuine products.

121. As it discovered such Counterfeiter Ads, Plaintiff submitted IP infringement reports to Facebook identifying advertisements that misused Plaintiff's Registered Works, the Betty's Best Marks, and the HOPGT Design Patent. Each report identified the advertiser's active ads by Facebook Ad Library ID number, and a report often covered several ads that ran the same content. From September 1, 2021 through September 22, 2023, Plaintiff's reports identified thousands of Counterfeiter Ads.

122. Despite Plaintiff's reports, Facebook took no action to stop the Facebook Advertisers from using Facebook ads to promote the sale of counterfeit products. Facebook continued to display Counterfeiter Ads using Plaintiff's Registered Works, the Betty's Best Marks, and the HOPGT Design Patent. Many of the Facebook pages that the Counterfeiter Ads linked to remained active and

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

were not removed. Many pages went down briefly and became active again days later, and many pages were reported four to six times and still were not removed.

123. Facebook possesses and regularly uses technology that is readily available to search for and identify specific images, text appearing in images, and marks appearing in images or video, across its platform. Facebook has the ability and the technology to locate infringing ads through image and mark searches and other technology, and to block infringing ads from entering the Facebook feed, but Facebook chooses to allow Counterfeiters to use the site on a repeat basis and ignores pleas from rights holders to fix the problem in a meaningful way.[36]

124. Facebook uses image and video matching technology. In October 2021, Facebook's Brand Registry web page stated that rights owners could use image and video search tools in the Brand Registry dashboard to report infringement. Facebook removed that statement from its website within a short time. Facebook denied Plaintiff's application for Brand Registry in October 2021, shortly after the infringement began, so Plaintiff could search only by text in the public online Ad Library. Facebook admitted Plaintiff to Brand Registry only when it reinstated one of Plaintiff's three ad accounts. By then the dashboard had no video search, and it allowed Plaintiff to report only one infringement for each Facebook Page, so ads that infringed both a trademark and a copyright were under-reported. Plaintiff therefore returned to the public online form to report the trademark and copyright infringement of the same Facebook Page separately.

125. Facebook's own storage and distribution of the Counterfeiter Ads, coupled with its promotion of its self-proclaimed "robust" takedown program, has the effect of creating an aura and expectation of authenticity in Facebook users, such that a Facebook user who sees a Counterfeiter Ad assumes the pictured products are the products he or she will receive and that Facebook has approved the use of its platform to advertise those goods.

126. As a direct and proximate result of Facebook's display and distribution of Counterfeiter Ads using Plaintiff's Registered Works, the Betty's Best Marks, and the HOPGT

[36] *About Brand Rights Protection*, Meta Business Help Center, https://www.facebook.com/business/help/828925381043253 (last visited Sept. 25, 2026).

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

Design Patent, Plaintiff suffered a diversion of sales, a lessening of goodwill associated with the Betty's Best Marks and its products, and costs associated with policing and enforcement, including legal fees and investigative fees.

### *E. The SDFL Action and the Advertiser Action*

127. Plaintiff first sued the operators of the websites and marketplace storefronts that sold the counterfeit goods. Plaintiff filed that suit as the SDFL Action and obtained a temporary restraining order in it. The order did not reach Facebook or the Facebook Advertisers' use of Facebook to promote the counterfeit goods.

128. Many of the websites that Plaintiff sued in the SDFL Action were also among the Facebook Advertisers' websites in the Advertiser Action. For most of those websites the company that operated the website was not the company that placed the Counterfeiter Ads because the Counterfeiter Ads were placed through advertising agencies in Hong Kong, as alleged below.

129. On September 13, 2023, Plaintiff filed the Advertiser Action against the Facebook Advertisers in this District. Plaintiff did not know the identities of the Facebook Advertisers, and only Facebook knew who paid for and placed the Counterfeiter Ads. Plaintiff therefore sought expedited discovery from Facebook, an order barring the Facebook Advertisers from placing further ads that used Plaintiff's intellectual property, and a freeze of the Facebook Advertisers' assets held by Facebook.

130. Facebook was not a defendant in the Advertiser Action, but it appeared there through counsel as a non-party on September 25, 2023. Facebook opposed Plaintiff's application for a temporary restraining order, asset freeze, and expedited discovery, and it appeared at the September 26, 2023 hearing on that application. Facebook therefore had actual notice of the Advertiser Action, Schedule A, and Plaintiff's claims no later than September 25, 2023.

131. Plaintiff issued a subpoena to Facebook in the Advertiser Action on September 26, 2023, and re-issued it on September 29, 2023, for records identifying the Facebook Advertisers. The subpoena attached a list that gave the name, link, and Page ID of each Facebook Advertiser's Facebook page, with its website and landing page. Certain Facebook Advertisers moved to quash the

subpoena, and the Court denied the motion on January 4, 2024. Plaintiff obtained stipulated consent judgments and permanent injunctions against a number of the Facebook Advertisers and voluntarily dismissed the others. The Advertiser Action closed on July 2, 2025.

132. Facebook had specific, itemized notice of the infringing videos. Plaintiff's reports, described above, covered Plaintiff's intellectual property, including the Registered Works, and identified the infringing ads and videos by Facebook Ad Library ID number. Plaintiff then gave Facebook Schedule A and the subpoena in the Advertiser Action, which identified each Facebook Advertiser's page by name, link, and Page ID.

133. The videos that the Facebook Advertisers used without permission are Plaintiff's Registered Works.

134. Facebook therefore knew, from the date of the first report covering each video and in any event no later than September 25, 2023, which Facebook pages and accounts were publishing Plaintiff's videos without permission. Facebook could have removed those videos, and disabled the pages and accounts that posted them, with simple measures that were within its control. It did not do so.

135. On November 1, 2026, Plaintiff checked 343 Facebook pages that ran Counterfeiter Ads for the websites at issue in the Advertiser Action. On 133 of those pages, Facebook still hosted videos copied from Plaintiff's Registered Works.

### *F. The Facebook Advertisers and Facebook's Advertising System*

136. Facebook provides a self-service tool called Ads Manager to all advertisers. The Counterfeiter Ads were created, placed, and managed through Ads Manager by the Counterfeiters' operations staff, using ad accounts obtained through advertising agencies, as alleged below. For each ad, the advertiser uploaded the images or video, wrote the text and description, and entered the address of the destination website.

137. Facebook's advertising system automatically reviews each ad for eligibility to publish. That review approved the Counterfeiter Ads, which used Plaintiff's photographs, videos, marks, and patented design. Facebook then published and delivered them to Facebook users.



SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

138. Facebook does not operate in mainland China, and the Counterfeiters operated in China. The Counterfeiters therefore placed their Facebook ads through advertising agencies located in Hong Kong (the "Ad Agencies"). The Counterfeiters identified the Ad Agencies for each of the 88 websites. The Ad Agencies acted as intermediaries and gave the Counterfeiters management access to the ad accounts. The Ad Agencies did not review or approve the ads, and the Counterfeiters uploaded and ran the Counterfeiter Ads themselves. At least seven Ad Agencies were involved, and one Ad Agency served more than half of the Facebook Advertisers.

139. Facebook's records for the ad accounts did not identify the Counterfeiters. The Facebook Advertisers did not own the email addresses that Facebook's records tied to the Counterfeiter Ads.

140. About 30 companies operated the 88 websites that the Counterfeiter Ads promoted. Five different companies located in Hong Kong placed the Counterfeiter Ads for all 88 websites, and for most of the websites the company that placed the ads was not the company that operated the website. One company operated 13 of the websites.

141. Those 88 websites processed thousands of orders worldwide, including thousands in the United States. Many Facebook Advertisers targeted consumers in other countries, mainly countries where Plaintiff's authorized retailers sell its products. The Counterfeiters identified ten manufacturers and suppliers in China of the counterfeit groomers. For each advertisement, Facebook received revenue from the Counterfeiter Ads in amounts that are currently unknown but will be requested in discovery.

142. Facebook did not tell the Facebook Advertisers about Plaintiff's reports. Upon information and belief, the Facebook Advertisers received no notice that Plaintiff had reported their ads. Facebook ordinarily does not tell an advertiser that a rights holder has reported its ad. When Facebook rejected an ad, it told the advertiser only that the ad went against Facebook's Advertising Standards, Community Standards, or Terms of Service. Facebook gave no specific reason. The Facebook Advertisers filed no counternotifications and had no communications with Facebook about Plaintiff's reports.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

### G. *Facebook's Knowledge, Control, and Profit*

143. Facebook had actual notice of the Counterfeiter Ads. Beginning in September 2021, Plaintiff reported the Counterfeiter Ads it found to Facebook through Facebook's own copyright and trademark report forms, and its reports identified thousands of Counterfeiter Ads. Each report identified one or more advertisements that used Plaintiff's intellectual property without authorization.

144. Plaintiff's copyright reports were notifications of claimed infringement under 17 U.S.C. § 512(c)(3)(A). Each report was signed and identified the copyrighted work and the infringing ad, by its Facebook Ad Library ID number, with enough information for Facebook to locate the ad. Each gave Plaintiff's contact information and stated that Plaintiff had a good-faith belief that the use was not authorized by the copyright owner, its agent, or the law, and that the information in the report was accurate and, under penalty of perjury, that Plaintiff was authorized to act for the copyright owner.

145. In the fall of 2021, Plaintiff also opened a support case with Facebook about the Counterfeiter Ads. Plaintiff repeatedly asked Facebook in the case to stop the infringement of Plaintiff's copyrights, trademarks, and patent. In its first message, Plaintiff told Facebook that it could look in Plaintiff's own ad accounts to confirm that Plaintiff created the videos that Facebook was approving for the Counterfeiters, and that Plaintiff had been running those videos in its own ads, including when the first infringing ad appeared. Plaintiff identified its brand, its founder in the videos, the counterfeit products, and the Facebook page that Plaintiff hosted in its account, and it told Facebook that Facebook was still approving infringing ads. Plaintiff also told Facebook in the case that the support button in Plaintiff's Ads Manager account was disabled, that Plaintiff owned the patent and trademark rights, and that Plaintiff had not authorized anyone to use its intellectual property. By then, about one month after Plaintiff first saw an infringing ad, more than 200 advertisers had run Counterfeiter Ads. The case remained open until June 3, 2022. On that date Facebook closed the case without resolving it and told Plaintiff to contact Meta's legal department in Ireland about the issue.

146. Facebook did not act promptly or consistently. Facebook often did not respond to Plaintiff's reports for days or weeks, it removed some ads and left others that ran the same content, and Plaintiff had to report some ads and pages again. Plaintiff also hired a law firm to help stop the Counterfeiter Ads, and the firm was unsuccessful.

147. Facebook had notice of Plaintiff's rights. Plaintiff's trademarks, copyrights, and design patent were registered, and Plaintiff marked its products with a patent notice.

148. Plaintiff told Facebook in its reports that it owned a patent on the product, beginning with its report of September 1, 2021. On December 6, 2021, Plaintiff told Facebook that ads copying the StripHair design violated Plaintiff's design patent. On January 31, 2022, Plaintiff submitted a report to which it attached a copy of the HOPGT Design Patent. On February 2, 2022, Plaintiff wrote to a Facebook employee who had offered to refer its case to Meta's legal department, and it listed patent infringement among the violations.

149. On March 2, 2022, Plaintiff again told Facebook that an advertiser's ad infringed Plaintiff's patent. Plaintiff made similar statements in many later reports. Facebook therefore had notice of the HOPGT Design Patent no later than February 2, 2022, and in any event no later than September 25, 2023, when it appeared in the Advertiser Action, in which Plaintiff asserted that patent.

150. Facebook alone held the records for each ad account and received the payments for the Counterfeiter Ads. While those records did not identify the Counterfeiters, Facebook knew or should have known with minimal diligence that there was a relationship between the Facebook Advertisers and the Hong Kong based Ad Agencies whose accounts were used to place the ads used to sell the Counterfeit goods.

151. Facebook reviews and approves each ad before publication, decides where and to whom each ad is shown, and can remove any ad or disable any advertiser at any time. Facebook had that control over the Counterfeiter Ads and did not use it to stop the Counterfeiter Ads that Plaintiff reported.

152. Facebook could have required the Ad Agencies to verify who was placing the ads, to stop supplying accounts to advertisers that Plaintiff reported, and to stop supplying accounts to

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

repeat infringers. Facebook could have and should have performed an investigation into the Hong Kong Ad Agencies that facilitated the placement of Facebook Ads for the Chinese Facebook Advertisers. Facebook knew or should have known but was willfully blind to the scheme that facilitated the infringement and counterfeiting alleged herein. Facebook had the necessary information and either refused to act because doing so was against its profit interests or was willfully blind to the scheme and recklessly failed or neglected to act.

153. Facebook earns revenue by charging advertisers for each ad, including on a per-click basis. It profited from the Counterfeiter Ads in that way, and it continued to collect those fees after Plaintiff's reports.

### *H. Harm to Plaintiff*

154. The Counterfeiter Ads promoted counterfeit products at an average price about 50% lower than the price of Plaintiff's genuine products. Since 2015, Plaintiff had enforced a minimum advertised price policy with its U.S. retailers, and it adhered to that policy on its own website and on Amazon.com. The Counterfeiter Ads undercut that price and forced Plaintiff to consider lowering its prices to compete.

155. The Counterfeiter Ads caused confusion about the source and quality of the advertised products. Consumers who mistakenly believed that counterfeit products came from Plaintiff were likely to form a poor opinion of Plaintiff's products. Plaintiff lost control over the quality of goods sold under the Betty's Best Marks, and it lost goodwill and the exclusivity of its brand.

156. Consumers who saw a Counterfeiter Ad could also buy the counterfeit products from the Counterfeiters' listings on third-party marketplaces, which used the same copied photographs and text. Outside the United States, Plaintiff could not obtain takedowns of counterfeit listings on marketplaces such as Amazon, and the Counterfeiters' use of Plaintiff's names, photographs, and videos to sell counterfeit products there continues.

157. Plaintiff created its photographs and videos over several years at great expense, including footage of horses and dogs that Plaintiff filmed and edited. Plaintiff cannot replace that

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

footage with computer-generated content. Replacing it would require new filming of horses and dogs with a professional photographer, videographer, and editing team, at substantial cost. Facebook's conduct made the existing content worth much less.

158. Because Plaintiff expected new content to be copied in the same way, Plaintiff stopped creating new Betty video content.

159. While Facebook disabled Plaintiff's ad accounts, the Counterfeiters used Plaintiff's creative content and Betty to sell counterfeit products with impunity. When Plaintiff finally years later regained the use of its creative content, the videos and images that had earned high revenue no longer produced results. The data that Plaintiff had used to target its ads, which was available for only six months, was no longer available. By then, many consumers had bought a counterfeit product associated with the StripHair brand, and many consumers no longer trusted Betty. Plaintiff's authorized retailers could no longer sell the product well using Plaintiff's copyrighted images, because too many consumers had seen that content associated with the counterfeit. Plaintiff's sales have declined significantly since 2021.

160. Ultimately, Plaintiff's sales revenue dropped 75% in the last quarter of 2021, and Plaintiff's lost sales between 2021 and 2022 were substantial. Plaintiff also spent substantial sums on investigators and legal fees to police the Counterfeiter Ads.

161. Money damages alone cannot repair this harm. The loss of goodwill, the loss of control over Plaintiff's brand and quality standards, and the loss of future sales cannot be measured precisely.

## TOLLING OF LIMITATIONS PERIODS

162. Plaintiff was a member of the putative class in *Cook v. Meta Platforms, Inc.*, No. 4:22-cv-02485-AMO (N.D. Cal.) (the "Cook Action"), which Jennifer L. Cook filed against Facebook on April 22, 2022. The putative class included all Registered Owners in the United States for whom Facebook displayed an image of their Registered Works in a Facebook advertisement without consent. Plaintiff was such a Registered Owner.

163. The Cook Action asserted claims against Facebook that arose from the same Counterfeiter Ad conduct alleged in this Complaint. Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the filing of the Cook Action tolled the limitations periods for Plaintiff's claims arising from that conduct from April 22, 2022 until the Court denied class certification on August 17, 2026. Plaintiff filed this Complaint within the remaining limitations period.

**<u>FIRST CAUSE OF ACTION</u>**

**DIRECT COPYRIGHT INFRINGEMENT**

164. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

165. Facebook infringed upon the rights of Plaintiff in violation of the Copyright Act. Without authorization, Facebook displayed copies of Plaintiff's Registered Works through Facebook advertisements, through its ad-targeting algorithms and profit-focused policies.

166. Facebook displayed, reproduced, and generated revenue from Plaintiff's Registered Works without authority from Plaintiff.

167. Facebook's acts and omissions alleged herein were in total disregard of Plaintiff's exclusive rights to display, create derivative works from, and distribute its Registered Works. Facebook's violations of the Copyright Act were intentional and willful and constituted multiple acts of infringement.

168. Facebook stored images of Plaintiff's Registered Works on its computers and/or systems and communicated those images to its users and the public through advertisements and shared posts. Facebook goes beyond merely posting what users provide it and takes the next step of using technology to purposely approve or deny ads and directly connect the ads containing infringing content to potential purchasers of counterfeit goods, reaching an audience that Counterfeiters could not otherwise reach.

169. Facebook directly participates in Counterfeiter Ad approval and publication through the Facebook Ad Platform approval process, which includes scanning ads for issues such as design and content compliance.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

170. Pursuant to the Copyright Act, 17 U.S.C. § 106(5), Facebook's storage, display, and distribution of images of Plaintiff's Registered Works was a violation of Plaintiff's exclusive rights to display and distribute those Registered Works.

171. Facebook infringed the copyrights in Plaintiff's Registered Works and, unless enjoined by this Court, will continue to do so.

172. Plaintiff is entitled to statutory damages of not less than $750 and up to $30,000 for each work infringed, or, to the extent the infringement is found to be willful, up to $150,000 per work infringed, as provided by the Copyright Act, 17 U.S.C. § 504(c), or, in the alternative, Plaintiff's actual damages and Facebook's profits attributable to the infringement, together with Plaintiff's costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## SECOND CAUSE OF ACTION

## CONTRIBUTORY COPYRIGHT INFRINGEMENT

173. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

174. Counterfeiters directly infringed Plaintiff's exclusive reproduction, duplication, and distribution rights through the advertisement, using Plaintiff's own copyrighted images, of counterfeit goods that are substantially the same as, or identical to, Plaintiff's goods.

175. Facebook controls, operates, manages, and monitors the platform Counterfeiters use to widely spread their infringing advertisements. To the extent Facebook claims that third parties, not Defendant, violated Plaintiff's exclusive rights under the Copyright Act, Facebook knowingly and materially contributed to the infringement.

176. Facebook engaged in the business of knowingly and systematically inducing, causing, and/or materially contributing to the unauthorized reproduction, adaptation, public display, and/or distribution of copies of Plaintiff's Registered Works, and thus to the direct infringement of Plaintiff's works.

177. Facebook materially contributed to the Counterfeiters' direct infringement in at least three distinct ways: (1) knowingly publishing infringing advertisements on its site; (2) configuring

and applying an algorithm to Counterfeiter Ads to target specific consumers; and (3) failing to remove infringing advertisements after being notified.

178. By supplying the advertising platform, and failing to monitor, manage, and control the advertisements on the site, Facebook facilitated, encouraged, and enabled the direct infringement of Plaintiff's Registered Works.

179. Facebook’s contribution continued after it had specific knowledge of specific infringing content. After Facebook received Plaintiff’s notices and the Schedule A and subpoena information described above, it continued to host, display, and distribute copies of Plaintiff’s registered videos on the Facebook pages that Plaintiff had identified, although it could have removed them with simple measures. On November 1, 2026, videos copied from Plaintiff’s Registered Works remained on 133 of the 343 pages that Plaintiff checked. Facebook’s failure to take those measures materially contributed to the direct infringement of the Registered Works by the Facebook Advertisers and the other Counterfeiters.

180. Facebook’s conduct constituted contributory infringement of Plaintiff’s copyrights and exclusive rights in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501. Facebook's knowing and material contribution to the infringement of Plaintiff's Registered Works, each time such a work was advertised through a unique URL or unique Counterfeiter, constituted a separate and distinct act of infringement for which Facebook is liable.

181. Facebook's knowing and material contribution to the infringement of Plaintiff's Registered Works was willful, intentional, and purposeful, and in disregard of and with indifference to Plaintiff's rights.

182. As a direct and proximate result of Facebook's infringement, Plaintiff has suffered damages and is entitled to recover actual damages and Defendant's profits, or, alternatively, statutory damages pursuant to 17 U.S.C. § 504(c) of up to $150,000 per work infringed by virtue of Defendant's willful infringement, together with injunctive relief under 17 U.S.C. §§ 502–505 and Plaintiff's costs and attorneys' fees.



SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

## THIRD CAUSE OF ACTION

## VICARIOUS LIABILITY FOR COPYRIGHT INFRINGEMENT

183. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

184. Plaintiff is the exclusive owner of the Registered Works at issue in this action.

185. Counterfeiters using Facebook's products and services directly infringed Plaintiff's copyrights through the use of Plaintiff's Registered Works in advertisements without authorization, in violation of 17 U.S.C. §§ 106, 501.

186. Facebook is liable as a vicarious infringer for the copyright infringement committed through each of the products and services it provided to Counterfeiters, including: (1) knowingly publishing advertisements using Plaintiff's Registered Works on its site; (2) configuring and applying an algorithm to Counterfeiter Ads to deliver infringing images to specific, targeted consumers; and (3) failing to remove infringing advertisements after being notified. At all relevant times, Facebook had the right and ability to control and/or supervise the infringing conduct of Counterfeiters and derived a direct financial interest and substantial benefit from the infringement of Plaintiff's Registered Works.

187. Facebook has the right and ability to terminate advertisers and remove advertisements and products from its site, or to block certain accounts from using the platform to advertise and approves every ad before it is published to its sites. Facebook's Advertising Terms and Conditions give Facebook the right to "monitor and otherwise investigate" links and ads to ensure compliance with Facebook's policies and reserve the right to terminate non-compliant users or advertisers.

188. Facebook obtains a direct financial benefit from Counterfeiters through their ad purchases, including on a per-click basis. Despite having control over the Counterfeiter Ads and the ability to stop the infringing conduct, Facebook did not stop the infringement of Plaintiff's Registered Works, directly harming Plaintiff's ability to sell its products and damaging Plaintiff's reputation.

189. As a direct and proximate result of Facebook's misconduct, Plaintiff has suffered damages and is entitled to relief in an amount to be proven at trial, including statutory damages

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

under 17 U.S.C. § 504 of up to $150,000 for each Registered Work infringed, together with Plaintiff's costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

190. Facebook's conduct has caused, and unless enjoined by this Court will continue to cause, Plaintiff great and irreparable injury that cannot be fully compensated or measured in money. Plaintiff has no adequate remedy at law and is entitled to a permanent injunction prohibiting further infringement of its Registered Works pursuant to 17 U.S.C. § 502.

**FOURTH CAUSE OF ACTION**

**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. §§ 1114, 1116, 1117)**

191. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

192. Plaintiff owns valid and subsisting federal registrations for the Betty's Best Marks, STRIPHAIR (Reg. No. 5072866) and THE GENTLE GROOMER (Reg. No. 5328641), for grooming tools for pets in International Class 21. The registrations are prima facie evidence of the validity of the marks and of Plaintiff's exclusive right to use them in commerce. The Betty's Best Marks are incontestable.

193. Facebook and the Counterfeiters used counterfeit and confusingly similar imitations of the Betty's Best Marks in commerce, without Plaintiff's consent, in connection with the advertising, offering for sale, and sale of counterfeit grooming tools.

194. Facebook reproduced and stored the Counterfeiter Ads that bore the Betty's Best Marks. Facebook approved those ads, selected the audiences that saw them, and delivered them to Facebook users in return for payment. Facebook thereby used the Betty's Best Marks in commerce in connection with the advertising of goods.

195. Facebook's use was likely to cause confusion, mistake, and deception, and did cause confusion among members of the trade and the public as to the origin, sponsorship, and quality of the advertised goods.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

196. Facebook acted knowingly or with willful blindness. Plaintiff reported thousands of Counterfeiter Ads to Facebook, and Facebook nonetheless continued to publish Counterfeiter Ads that bore the Betty's Best Marks.

197. Facebook's conduct violated Section 32 of the Lanham Act, 15 U.S.C. § 1114.

198. To the extent the marks used in the Counterfeiter Ads were counterfeits within the meaning of 15 U.S.C. § 1116(d), Plaintiff is entitled to elect statutory damages under 15 U.S.C. § 1117(c) of up to $2,000,000 per counterfeit mark per type of goods advertised or sold. Alternatively, Plaintiff is entitled to recover Facebook's profits, Plaintiff's damages, and its costs under 15 U.S.C. § 1117(a). Because Facebook's conduct was willful, Plaintiff is also entitled to enhanced damages and its reasonable attorneys' fees under 15 U.S.C. § 1117(a) and (b).

199. Facebook's conduct has caused, and unless enjoined by this Court will continue to cause, Plaintiff irreparable injury to its goodwill and reputation. Plaintiff has no adequate remedy at law and is entitled to injunctive relief under 15 U.S.C. § 1116.

## FIFTH CAUSE OF ACTION

## CONTRIBUTORY AND VICARIOUS TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)

200. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

201. The Counterfeiters directly infringed the Betty's Best Marks by using counterfeit and confusingly similar imitations of them, without Plaintiff's consent, in the Counterfeiter Ads and in the sale of counterfeit goods.

202. Facebook intentionally induced that infringement. Alternatively, Facebook continued to supply its advertising platform to Counterfeiters that it knew or had reason to know were infringing the Betty's Best Marks.

203. Facebook had actual knowledge of the infringement. Plaintiff reported thousands of Counterfeiter Ads to Facebook, and many Counterfeiter pages were reported four to six times and not removed. Facebook was also willfully blind to the infringement, although it has the technology to detect it.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

204. Facebook materially contributed to the infringement. It approved, published, and targeted the Counterfeiter Ads, and it allowed reported Repeat Infringers to continue to advertise.

205. Facebook is also vicariously liable. Facebook and the Counterfeiters jointly controlled the Counterfeiter Ads. The Counterfeiters supplied the content and the payment. Facebook approved the ads, set the terms of their delivery, selected and expanded their audiences, and received payment for each ad.

206. Facebook had the right and ability to stop the infringement, and it derived a direct financial benefit from it. Facebook's conduct was willful.

207. Plaintiff has been damaged. Plaintiff is entitled to recover Facebook's profits, Plaintiff's damages, enhanced damages, and its costs and reasonable attorneys' fees under 15 U.S.C. § 1117, and to injunctive relief under 15 U.S.C. § 1116.

## SIXTH CAUSE OF ACTION

## VIOLATION OF THE LANHAM ACT – FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125)

208. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

209. Pursuant to 15 U.S.C. § 1125, any person in commerce who uses any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin or sponsorship of goods, or (b) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of goods, is liable to any person who believes he or she is likely to be damaged by such act.

210. The Counterfeiter Ads that Facebook showed to its users and otherwise used in its advertising depicted Plaintiff's products and/or the Betty's Best Marks, as designed, produced, and used by Plaintiff. The actual goods the Facebook advertisements were selling, however, were not made by Plaintiff and were listed for different prices than Plaintiff charged for its genuine products.

The advertisements Facebook uploaded and targeted to its users thus misrepresented the nature, quality, and origin of Plaintiff's products and otherwise confused the public, leading the public erroneously to believe either that Plaintiff grossly overcharged for its products and the same quality products could be purchased at a much lower price, or that Plaintiff was associated with the counterfeit ads and offers for sale, when in fact consumers who purchased through those ads received a cheap knockoff product.

211. Facebook is no mere bystander to the activities taking place on its systems and servers. Facebook controls and orchestrates the advertisement and sale of counterfeit goods knowingly and/or with willful blindness and relies on Counterfeit Ads and Counterfeiters for a meaningful part of its core business revenue.

212. Facebook directly used, employed, promoted, and benefited from the Counterfeiter Ads. Facebook stored copies of Plaintiff's Registered Works and the Betty's Best Marks and reproduced copies of them in Counterfeiter Ads on its servers and via its algorithms, with the express purpose of disseminating the images to Facebook users for its own direct financial benefit, and decided through its own algorithms how, when, and where to use those materials in the Counterfeiter Ads it selected to show Facebook users.

213. Upon information and belief, Counterfeiters and/or Facebook removed identifying marks from Plaintiff's Registered Works as used in the Counterfeiter Ads, thereby using, employing, and promoting Plaintiff's Registered Works in the Counterfeiter Ads to create confusion about, and misrepresent the source of, the counterfeit goods. Facebook used these altered images in the Counterfeiter Ads it showed Facebook users and benefited from that use.

214. Facebook is a sales and advertising platform, and it directly competed with Plaintiff by advertising for sale counterfeit, competing goods offered by Counterfeiters. Facebook presented unfair competition to Plaintiff because it was paid by Counterfeiters for the use of Facebook's massive marketing machine and for diverting users to counterfeit goods using the Counterfeiter Ads.

215. For its own direct financial benefit, Facebook stored and continued to reproduce copies of Plaintiff's Registered Works and the Betty's Best Marks in Counterfeiter Ads on its servers and via its algorithms, after having knowledge of the infringing content and the false designation of

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

the counterfeited goods, with the express purpose of disseminating the images to Facebook users. This demonstrated that Facebook acted with willful blindness, and that Facebook used the counterfeited goods, after it knew they were counterfeit, in commerce to unilaterally create ad revenue, directly damaging Plaintiff's ability to sell its products through its own or any other sales channel.

216. Facebook further willfully blinded itself to facts that would put it on notice that it was using and promoting Plaintiff's Registered Works and the Betty's Best Marks without permission through the Counterfeiter Ads.

217. Facebook's acts and omissions in relation to the Counterfeiter Ads were false and misleading material representations of fact conducted via commercial advertising in interstate commerce. The Counterfeiter Ads and associated images and marks were false, misleading, and deceptive as to the affiliation of the advertisements and the origin of the goods in question, resulting in confusion as to whether the advertisements and associated goods originated from rights holders such as Plaintiff. Consumers who purchased from a Counterfeiter Ad often received cheap knockoffs of the pictured product, or nothing at all, and dissatisfied purchasers on occasion mistakenly contacted legitimate brand owners such as Plaintiff to complain.

218. The Counterfeiter Ads, the websites that the ads linked to, and the packaging images also used Betty’s name, image, and words, and Plaintiff’s videos in which Betty appears. Consumers who saw them were likely to believe that Betty and Plaintiff made, approved, or endorsed the advertised products, when they did not. Facebook’s approval and delivery of those ads, after notice from Plaintiff, was likely to cause confusion as to the affiliation, connection, or association of the Counterfeiters with Plaintiff, and as to Plaintiff’s sponsorship or approval of the advertised goods, within the meaning of 15 U.S.C. § 1125(a)(1)(A).

219. As a direct and proximate result of Facebook's display and distribution of Counterfeiter Ads through its targeted advertisements and algorithms, particularly after being notified that use of Plaintiff’s Registered Works and/or the Betty’s Best Marks violated Plaintiff’s rights, Plaintiff suffered a diversion of sales and a lessening of goodwill associated with its products and the Betty's Best Marks.

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

220. Plaintiff is entitled to damages in an amount to be proven at trial, and, upon a showing of willfulness, to enhanced damages of up to three times the amount of actual damages suffered, together with Plaintiff's costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**SEVENTH CAUSE OF ACTION**

**DESIGN PATENT INFRINGEMENT (35 U.S.C. §§ 271, 283, 284, 285, 289)**

221. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

222. Plaintiff owns all right, title, and interest in the HOPGT Design Patent, U.S. Patent No. D841,900 S, titled "Horse or Pet Grooming Tool," which issued on February 26, 2019. The HOPGT Design Patent is valid and has not expired. Plaintiff marked its products with a patent notice.

223. The Counterfeiter Ads advertised and offered for sale goods with a design that was substantially the same as the design claimed in the HOPGT Design Patent. In the eye of an ordinary observer, giving such attention as a purchaser usually gives, the two designs were substantially the same. The observer would have been deceived into believing that the accused design was the patented design. The thumbnail image that the Counterfeiters placed over Plaintiff's videos in the Counterfeiter Ads showed the exact patented product, taken from Plaintiff's main product image, and not merely a similar product.

224. Upon information and belief, Facebook directly infringed the HOPGT Design Patent under 35 U.S.C. §§ 271(a) and 289. Together with the Counterfeiters, Facebook offered to sell and exposed for sale, within the United States, articles bearing the patented design. It did so through the Counterfeiter Ads that it approved, published, and delivered to consumers in the United States for its own profit.

225. Facebook also induced infringement of the HOPGT Design Patent under 35 U.S.C. § 271(b). Facebook knowingly supplied the platform, tools, and targeting that the Counterfeiters used to offer and promote the infringing goods. Facebook knew of the HOPGT Design Patent no later than February 2, 2022, and in any event no later than September 25, 2023, when it appeared in the



SRIPLAW

CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

Advertiser Action, and it knew or was willfully blind to the fact that the Counterfeiters' goods infringed the patent.

226. Facebook's infringement was willful. Facebook had notice of the HOPGT Design Patent and continued to publish the Counterfeiter Ads.

227. Plaintiff has been injured. Plaintiff is entitled to damages adequate to compensate it for the infringement, and in no event less than a reasonable royalty, under 35 U.S.C. § 284. Alternatively, Plaintiff is entitled to Facebook's total profit under 35 U.S.C. § 289. Plaintiff is also entitled to enhanced damages and, because this case is exceptional, its reasonable attorneys' fees under 35 U.S.C. §§ 284 and 285.

228. Unless enjoined under 35 U.S.C. § 283, Facebook will continue to infringe, and Plaintiff will suffer irreparable harm for which it has no adequate remedy at law.

## EIGHTH CAUSE OF ACTION

## COMMON LAW UNFAIR COMPETITION

229. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

230. Facebook's conduct constituted unfair competition under California common law.

231. Facebook advertised, and promoted the sale of, goods that bore counterfeits and confusingly similar imitations of the Betty's Best Marks, which used Plaintiff's copyrighted photographs and videos, and that copied the design of Plaintiff's patented product. Facebook did so in competition with Plaintiff's genuine goods and without Plaintiff's consent.

232. Facebook's conduct was likely to cause, and did cause, confusion, mistake, and deception among members of the trade and the public as to the origin and quality of the advertised goods.

233. Facebook also diverted users and sales away from Plaintiff and its authorized retailers, reduced the visibility of Plaintiff's genuine goods on Facebook and across the internet, and appropriated the goodwill of the Betty's Best Marks for its own profit. Facebook also disabled Plaintiff's ad accounts while it continued to run Counterfeiter Ads that used Plaintiff's videos, which

prevented Plaintiff from using Facebook to reach customers and compete. Facebook also disabled the support button in Plaintiff's Ads Manager account and denied Plaintiff access to Facebook's Brand Registry, which Plaintiff needed to search for and report infringing content, until Facebook reinstated one of Plaintiff's three ad accounts.

234. Plaintiff has been damaged and has no adequate remedy at law. Facebook's conduct has caused, and unless enjoined will continue to cause, Plaintiff irreparable harm.

## NINTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

## (Cal. Bus. & Prof. Code § 17200, et seq.)

235. Betty's Best, Inc. incorporates the allegations of paragraphs 1 through 163 of this Complaint as if fully set forth herein.

236. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., prohibits any unlawful, unfair, or fraudulent business act or practice.

237. Facebook's conduct as described herein, including its display and distribution of Counterfeiter Ads using Plaintiff's Registered Works and the Betty's Best Marks, its material contribution to and vicarious liability for the sale of counterfeit goods, and its violations of the Copyright Act, the Lanham Act, and the Patent Act, constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Section 17200.

238. Facebook's conduct created harm to both Plaintiff and Facebook users (consumers), who were lured by Facebook advertisements targeted directly at them, purchased counterfeit products, and received cheap knockoffs of the advertised product, or nothing at all.

239. As a direct and proximate result of Facebook's unfair and unlawful business practices, Plaintiff has suffered injury in fact and has lost money or property, including diverted sales and diminished goodwill, and is entitled to recover restitution, injunctive relief, and such other relief as is available under Cal. Bus. & Prof. Code § 17203.

WHEREFORE, the Plaintiff BETTY'S BEST, INC. prays for judgment against the Defendant META PLATFORMS, INC., F/K/A FACEBOOK, INC. that:

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

SRIPLAW
CALIFORNIA ◆ FLORIDA ◆ GEORGIA ◆ INDIANA ◆ NEW YORK ◆ TENNESSEE

a. For an injunction enjoining Facebook from copying, reproducing, distributing, adapting, publishing, advertising, or publicly displaying, without prior authorization from Plaintiff, Plaintiff's Registered Works and the Betty's Best Marks, from advertising or promoting goods that infringe the HOPGT Design Patent, and requiring Facebook to remove or block any and all Repeat Infringers previously reported by Plaintiff for violating Plaintiff's ownership rights, or whom Facebook otherwise knows to be Repeat Infringers;

b. Awarding Plaintiff monetary compensation in the form of actual, consequential, and enhanced damages, and any other monetary damages or compensation allowed by law;

c. Awarding statutory damages under 17 U.S.C. § 504(c), up to $150,000 per Registered Work infringed, for each time it was infringed, to the extent the Court finds Facebook's infringement was willful, or, alternatively, Plaintiff's actual damages and Facebook's profits, and injunctive relief under 17 U.S.C. § 502;

d. Awarding damages, profits, enhanced damages, statutory damages, restitution, and injunctive relief pursuant to 15 U.S.C. §§ 1116 and 1117, 35 U.S.C. §§ 283, 284, and 289, and Cal. Bus. & Prof. Code § 17203, as applicable;

e. Awarding Plaintiff its costs, reasonable attorneys' fees, and pre- and post-judgment interest as allowed by law, including under 17 U.S.C. § 505, 15 U.S.C. § 1117, and 35 U.S.C. § 285;

f. Betty's Best, Inc. be awarded such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Betty's Best, Inc. hereby demands a trial by jury of all issues so triable.

DATED: November 12, 2026

Respectfully submitted,

*/s/ Matthew L. Rollin*
MATTHEW L. ROLLIN
**SRIPLAW, P.A.**
*Counsel for Plaintiff Betty's Best, Inc.*